UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYRUS PATSON,

                    Plaintiff,                Case No.:
                                                  Hon.:

v.

GRAND TRAVERSE COUNTY,
MICHIGAN; THOMAS J. BENSLEY,
in his official capacity as Sheriff of Grand
Traverse County; MICHAEL SHEA, in his
official capacity as Undersheriff of
Grand Traverse County; and CHRIS
BARSHEFF, in his official capacity as
Administrator of Grand
Traverse County Correctional Facility,

                    Defendants.

_____/

**VERIFIED COMPLAINT
AND REQUEST FOR EMERGENCY INJUNCTIVE RELIEF**

       Plaintiff Cyrus Patson complains against Defendants Grand Traverse County, Grand

Traverse County Sheriff Thomas J. Bensley in his official capacity, Grand Traverse County

Undersheriff Michael Shea in his official capacity, and Grand Traverse County Correctional

Facility Administrator Chris Barsheff in his official capacity (collectively, "Defendants") as

follows:

**PRELIMINARY STATEMENT**

       1.     This civil rights action challenges Defendants' denial of medically necessary

treatment for opioid use disorder ("OUD") at Grand Traverse County Correctional Facility ("the

Jail").

2.      The opioid epidemic has been devastating communities for decades, and its reach

continues to grow at an exponential rate.  In 1999, 118 people in Michigan died from opioid

overdoses.  By 2018, that number had grown to 2,036.[1]  Nationally, opioid overdoses are the

leading cause of death for Americans under 50 years old.[2]  In 2019, 70,630 people died from

drug overdoses—and 70% of those deaths involved an opioid.[3]  Every day, 136 people die from

an opioid overdose—equivalent to one person every 10.5 minutes.[4]

3.      The medical condition that is often referred to colloquially as "opioid addiction"

is known clinically as opioid use disorder ("OUD").  OUD is a chronic brain disease

characterized by the persistent use of opioids despite the harmful consequences of their use.[5]

Overdose and death are significant risks of opioid use.[6]

4.      Medication for opioid use disorder ("MOUD"), sometimes called medication for

addiction treatment ("MAT"), is widely regarded as the standard of care for the treatment of

OUD.  MOUD "is a comprehensive approach that combines FDA-approved medications with

counseling and other behavioral therapies to treat patients with opioid use disorder."[7]  MOUD is

---

[1] *Opioid Resources*, STATE OF MICH., https://www.michigan.gov/opioids/ (last visited Oct. 27, 2021) (hereinafter, "State of Michigan, *Opioid Resources*")

[2] Maya Salam, *The Opioid Epidemic:  A Crisis Years in the Making*, N.Y. TIMES (Oct. 26, 2017), https://www.nytimes.com/2017/10/26/us/opioid-crisis-public-health-emergency.html?.?mc=aud_dev&ad-keywords=auddevgate&gclid=CjwKCAjwzOqKBhAWEiwArQGwaJEdok3IbMjIldHH4DFezNuPhMrlqksi33Be0sFwGMp4WkL7IrpLkBoCiaAQAvD_BwE&gclsrc=aw.ds.

[3] *Opioid Overdose:  Understanding the Epidemic*, CTRS. FOR DISEASE CONTROL AND PREVENTION (last reviewed Mar. 17, 2021), https://www.cdc.gov/opioids/basics/epidemic.html (hereinafter "CDC, Understanding the Epidemic").

[4] *Id.*

[5] *Opioid Use Disorder*, YALE MED., https://www.yalemedicine.org/conditions/opioid-use-disorder (last visited Oct. 27, 2021) (hereinafter, "Yale Med., *Opioid Use Disorder*").

[6] *Id.*

[7] FDA News Release, Food & Drug Admin., FDA Approves First Generic Versions of Suboxone Sublingual Film, Which May Increase Access to Treatment for Opioid Dependence (June 14, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm610807.htm.

the *only* effective treatment for OUD.  Attempting to treat OUD without medication or through "cold turkey" withdrawal is not effective and is not a medically appropriate method of treatment.[8]

5.     Forcing someone who is currently successfully treated using MOUD to undergo withdrawal from their medication causes immediate and excruciating symptoms in the short-term, and massively increases the chances of a subsequent relapse and the resulting medical hazards, including a greatly heightened risk of fatal overdose.[9]

6.     Despite scientific consensus about the critical role of MOUD in treating opioid addiction, decades of entrenched stigma continue to serve as a systemic barrier to this life-saving treatment.  While science tells us MOUD is vital to recovery, pervasive stigma towards people with OUD continues to be a substantial barrier to treatment.[10]

7.     Defendants—Grand Traverse County, and county officials who are responsible for the operations and oversight of the Jail—are reinforcing precisely such stigma by failing to provide Suboxone as a matter of policy and practice to all peoplepeople who are incarcerated in the facility for more than a very short amount of time.

8.     Plaintiff Cyrus Patson is a 20-year-old resident of Traverse City who has severe OUD, for which his physician prescribes twice-daily Suboxone as treatment.  This has allowed him to make great progress in managing his OUD.  He attends counseling regularly and has

---

[8] Marc A. Schuckit, *Treatment of Opioid-Use Disorders*, 375 NEW ENG. J. MED. 357 (2016) (hereinafter, Schuckit, "*Treatment of Opioid-Use Disorders*").
[9] AM. SOC'Y OF ADDICTION MED., THE ASAM NATIONAL PRACTICE GUIDELINE FOR THE TREATMENT OF OPIOID USE DISORDER: 2020 FOCUSED UPDATE, 33 (Dec. 18, 2019),  *available at* https://www.asam.org/docs/default-source/quality-science/npg-jam-supplement.pdf(hereinafter "ASAM National Practice Guideline")
[10] Scott E. Hadland et al., *Stigma Associated with Medication Treatment for Young Adults with Opioid Use Disorder:  A Case Series,* 13 ADDICTION SCI. & CLIN. PRAC. 15 (2018).

developed healthy hobbies. He works on and rides dirt bikes, and works on small engines.  He is even working on the engine for a truck that he will be using when he is able to drive again.  He has also reconnected with his family.  None of this would have been possible without the Suboxone that his physician prescribes.

9.      Mr. Patson anticipates being sentenced to detention at the Jail on November 12, 2021.  Without intervention by this Court, Defendants will strip Mr. Patson of his prescribed treatment, disregarding sound medicine, including the broad consensus in the scientific community and the express judgment of his treating physician.[11]  The effects of sudden, forcible withdrawal from Suboxone will be immediate and excruciating, and will subject Mr. Patson to a heightened risk of death.[12]  Indeed, Defendants have previously forced Mr. Patson to undergo such a painful and forced withdrawal during a prior stay in the Jail despite his treating physician's explicit pleas that he receive proper treatment, and despite state court orders advising the Jail to provide treatment as recommended by his physician.

10.     The denial of necessary medical care violates Mr. Patson's constitutional right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution and his right to be free from discrimination based upon his disability as guaranteed by the Americans with Disabilities Act ("ADA").

11.     Mr. Patson seeks emergency, preliminary, and permanent relief to require Defendants to provide him with adequate medical care and prevent suffering.  Specifically, he seeks declaratory relief and a temporary, preliminary, and permanent injunction requiring

---

[11] Declaration of Dr. Kelly Clark (hereinafter "Clark Decl.") ¶ 22.
[12] *Id*. at  ¶¶ 17-18.

Defendants to provide him with access to his medically necessary, physician-prescribed Suboxone during the course of his incarceration at the Jail.

## PARTIES

12.    Mr. Patson is a 20-year-old man who resides in Traverse City, Michigan.  He has a disability, OUD, for which he is prescribed daily treatment with Suboxone.  Mr. Patson faces imminent detention at the Jail.

13.    Defendant Grand Traverse County, Michigan ("the County"), is a political subdivision of the State of Michigan that can be sued in its own name.  The County is responsible for all acts of the Grand Traverse County Sheriff's Office.  The Grand Traverse County Sheriff's Office oversees and administers the Jail and is responsible for the custody and care of all persons detained or incarcerated there.

14.    Defendant Thomas J. Bensley is the elected Sheriff of Grand Traverse County. He is the legal custodian of all people confined to the Jail and is responsible for the safe, secure, and humane treatment of these residents, including their medical care.  He has final policymaking authority with regard to the Jail.  At all relevant times, Defendant Bensley was and is acting under color of state law.  Defendant Bensley is sued in his official capacity.

15.    Defendant Michael Shea is the Undersheriff of Grand Traverse County.  He is responsible for operating the Jail and is responsible for the safe, secure, and humane treatment of the people confined to the Jail.  At all relevant times, Defendant Shea was and is acting under color of state law.  Defendant Shea is sued in his official capacity.

16.    Defendant Chris Barsheff is the Administrator of the Grand Traverse County Correctional Facility.  He has control and supervision of the Jail's employees and budget.  At all

relevant times, Defendant Barsheff was and is acting under color of state law.  Defendant

Barsheff is sued in his official capacity.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction under 28 U.S.C. § 1331 and 1343.  This action seeks

to vindicate rights guaranteed by the Eighth Amendment to the United States Constitution, under

42 U.S.C. § 1983.  This action is also brought under Title II of the Americans with Disabilities

Act, 42 U.S.C. §§ 12131–12134.

18.     Venue lies in the Western District of Michigan under 28 U.S.C. § 1391.

## FACTS

**A.     Opioid Use Disorder Is a Life-Threatening Medical Condition and a Public Health Crisis.**

19.     Opioids are a class of drugs that inhibit pain and have euphoric side effects.[13]

Some opioids, such as oxycodone, have accepted medical uses, including managing severe or

chronic pain.  Others, such as heroin, are not generally used in medicine in the United States, but

are sold on the black market.  All opioids are highly addictive.

20.     OUD is a chronic brain disease.  Symptoms of OUD include uncontrollable

cravings for and compulsive use of opioids, decreased sensitivity to opioids, and potentially

excruciating withdrawal symptoms.[14]  OUD is progressive, meaning it often becomes more

severe over time.[15]  Without effective treatment, patients with OUD are frequently unable to

control their use of opioids, often resulting in serious physical harm or death, including due to

accidental overdose.[16]

---

[13] Yale Med., *Opioid Use Disorder, supra*.

[14] *Id*., *supra*.

[15] Declaration of Dr. Richard N. Rosenthal (hereinafter "Rosenthal Decl.") ¶ 12.

[16] *Id*.

21.     OUD permanently rewires the brain for addiction.  People with OUD cannot simply "will" or "reason" their way out of continued opioid use, even when they are aware of the dire consequences.[17]  Continued use does not indicate a person lacks willpower, but rather is the predictable outcome of chemical changes in the brain that result in uncontrollable cravings.

22.     Opioid addiction has thus proven especially unresponsive to non-medication-based treatment methods, such as abstinence-only and twelve-step programs, which have been popular in treating other addictions such as alcoholism.[18]

23.     Like other chronic diseases, OUD often involves cycles of relapse and remission.[19]  Rather than a linear progression in which a person attains permanent abstinence from opioid use, "successful" recovery for OUD is often characterized by sustained periods of abstinence of "active recovery," punctuated by relapses in which the person returns to drug use. These relapses are frequently triggered by an increase in life stressors, a traumatic event, or a lapse in treatment, which causes the person to turn toward illicit drug use.[20]  The typical treatment goal for OUD is thus to maximize periods of active recovery and minimize periods of relapse, by ensuring continued treatment and encouraging the use of coping mechanisms and support systems.

24.     OUD is an epidemic in the United States and a public health crisis.  The incidence of OUD has skyrocketed since the late 1990s.  Between 1999 and 2017, the number of annual

---

[17] *Biology of Addiction*, *Drugs and Alcohol Can Hijack Your Brain*, NEWS IN HEALTH (Oct. 2015), https://newsinhealth.nih.gov/2015/10/biology-addiction.

[18] Schuckit, *Treatment of Opioid-Use Disorders*, *supra*.

[19] DIAGNOSTIC & STAT. MANUAL OF MENTAL DISORDERS (American Psychiatric Association, 5th ed. 2013) (hereinafter "DSM V").

[20] Rajita Sinha, *Chronic Stress, Drug Use, and Vulnerability to Addiction*, 1141 ANNALS N.Y. ACAD. SCI. 105 (2008).

opioid overdose deaths nationwide increased nearly sixfold.  As shown below,[21] since 1999, nearly 450,000 people in the United States have died from opioid overdose:



25.    The current COVID-19 pandemic, which has produced enormous grief, anxiety, and feelings of isolation, has further accelerated these trends.  In the one-year period ending December 2020, 69,710 people died from drug overdoses involving an opioid, compared with 50,963 in 2019.[22]

---

[21] CDC, *Understanding the Epidemic*, *supra*.
[22] Julie Steenhuysen & Daniel Trotta, *U.S. Drug Overdose Deaths Rise 30% to Record During Pandemic*, REUTERS U.S. (July 14, 2021, 6:30 PM), https://www.reuters.com/world/us/us-drug-overdose-deaths-rise-30-record-during-pandemic-2021-07-14/.

26.     The opioid epidemic has not spared Michigan.  From 1999 to 2018, deaths from opioid overdoses in Michigan increased from 118 to 2,036.[23]  In 2020, Michigan reported 2,684 overdose deaths.[24]  In a 2019 study partly authored by a County health official, opioid deaths in the County were found to have "dramatically increased in the past 5 years . . . .  Since 2009, the number of opioid overdose deaths has quintupled."[25]

27.     Since 2013, the proliferation of fentanyl and other synthetic opioids—an extremely dangerous class of drug—has been the primary driver of the sharp rise in opioid deaths.  As illustrated below,[26] a lethal dose of fentanyl is a tiny fraction of a lethal dose of heroin:



28.     Heroin and other illegal opioids are now commonly laced with fentanyl—often without the knowledge of the person using the opioids.  As a result, people with OUD who use

---

[23] State of Michigan, *Opioid Resources*, *supra*.

[24] *Opioid Resources, Data*, STATE OF MICH., https://www.michigan.gov/opioids/0,9238,7-377-94655---,00.html (last visited Oct. 27, 2021).

[25] Wendy Hirschenberger et al., *Grand Traverse County Substance Use Assessment*, 46 (May 1, 2019), https://www.gtcountymi.gov/DocumentCenter/View/11468/GTCO-Substance-Use-Assessment-2019-Final.

[26] Allison Bond, *Why Fentanyl is Deadlier than Heroin, in a Single Photo*, STAT NEWS (Sep. 29, 2016),  https://www.statnews.com/2016/09/29/why-fentanyl-is-deadlier-than-heroin.

illegal opioids, especially those who are undergoing MOUD treatment and suffer a brief relapse, now face a heightened risk of being unwittingly exposed to lethal doses of fentanyl.[27]

**B. Broad Scientific Consensus Confirms That MOUD Is Necessary to Treat OUD.**

29.     Medical science has provided hope by demonstrating that overdose deaths are preventable with effective treatment.

30.     Broad consensus in the medical and scientific communities confirms that MOUD, also known as "medication for addiction treatment" or "MAT," are effective—and in fact necessary—to treat OUD.  The American Medical Association, the American Society of Addiction Medicine, the U.S. Department of Health and Human Services, the U.S. Food and Drug Administration ("FDA"), the National Institute on Drug Abuse, the Office of National Drug Control Policy, and the Substance Abuse and Mental Health Services Administration ("SAMHSA") have all endorsed the necessity of MOUD.[28]

---

[27] *Id.*

[28] Barbara L. McAneny, *Landmark Deal on Medication-Assisted Treatment A Model for Nation,* AM. MED. ASS'N (Jan. 7, 2019), https://www.ama-assn.org/about/leadership/landmark-deal-medication-assisted-treatment-model-nation; AM. SOC. OF ADDICTION MED., *Policy Statement on Access to Medications for Addiction Treatment for Persons Under Community Correctional Control* (Jan 20, 2021), *available at* https://www.asam.org/advocacy/find-a-policy-statement/view-policy-statement/public-policy-statements/2021/01/25/access-to-medications-for-addiction-treatment-for-persons-under-community-correctional-control (hereinafter "ASAM, Policy Statement on Access to MAT"); *How Do Medications Treat Opioid Addiction?*, U.S. DEP'T OF HEALTH & HUM. SERVS. (Sep. 1, 2000), https://www.hhs.gov/opioids/treatment/medications-to-treat-opioid-addiction/index.html; *Information About Medication-Assisted Treatment (MAT)*, FOOD & DRUG ADMIN. (Feb. 14, 2019), https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat; *Opioid Use Disorder Affects Millions*, NAT'L INST. ON DRUG ABUSE (Nov. 2016), https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction (hereinafter, "Nat'l Inst. on Drug Abuse, *Opioid Use Disorder Effects Millions*"); *MAT Medications, Counseling, and Related Conditions*, SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN. (Sep. 15, 2021), https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions#medications-%20used-in-mat. (hereinafter "SAMHA, *MAT, Counseling, and Related Conditions*")

31.     Michigan government agencies also recognize that MOUD is necessary to treat OUD.  In 2019, Governor Whitmer and the Michigan Opioids Task Force announced that they would eliminate barriers to treatment for OUD by removing requirements to obtain prior authorization for MOUD in the Medicaid program.[29]  In doing so, the Governor and the Task Force explained that MOUD "is the gold standard for treating individuals with opioid use disorder, leading to significantly better outcomes."[30]  Likewise, the Michigan Department of Corrections (MDOC) has acknowledged that the benefits of providing MOUD include fewer cases of contraband introduction, less illicit substance abuse, fewer incidents of violence, and better post-release results.[31]  Marti Kay Sherry, administrator for the MDOC's Bureau of Health Care Services, recognized that "[m]edication-[a]ssisted [t]reatment, along with additional substance abuse treatment services, increases the likelihood of long-term recovery, reducing the chance of recidivism."[32]

32.     The two most recent presidential administrations have also embraced the importance of MOUD.  In November 2017, President Trump's Commission on Combating Drug Addiction and the Opioid Crisis acknowledged the efficacy of MOUD and the need to expand its availability to patients.[33]  Under President Biden, the Office of National Drug Control Policy has

---

[29] Press Release, Michigan.gov, Governor Whitmer, Michigan Opioids Task Force Announce Efforts to Combat Opioid Epidemic, Cut Opioid Deaths in Half (Nov. 14, 2019), https://www.michigan.gov/som/0,4669,7-192-29942_34762-512430--,00.html (hereinafter "Press Release, Michigan Opioids Task Force").

[30] *Id*.

[31] CORRECTIONS CONNECTION, *Ending Addiction: Michigan Department of Corrections Launches Medication-Assisted Treatment at Correctional Facilities*, 3-6 (Feb. 25, 2020), *available at* https://www.michigan.gov/documents/corrections/CC_FebruaryNewsletter2020_682036_7.pdf (hereinafter, "Corrections Connection, *Ending Addiction*").

[32] *Id*. at 4.

[33] THE PRESIDENT'S COMM'N ON COMBATING DRUG ADDICTION AND THE OPIOID CRISIS, FINAL REPORT, 15, 70 (Nov. 1, 2017), https://trumpwhitehouse.archives.gov/sites/whitehouse.gov

likewise identified MOUD as "evidence-based treatment" that "researchers, health care systems, and payers need to develop, scale up, and support."[34]

33.     Treatment with MOUD typically consists of medication combined with counseling and other behavioral therapies, but medication is the primary driver of efficacy.[35] MOUD decreases opioid use, reduces the risk of relapse and overdose death, and improves treatment retention.[36]  Treatment retention is crucial for treating OUD because patients are less likely to relapse the longer they stay in treatment.  Studies have shown that MOUD also decreases the likelihood of criminal activity and infectious disease transmission, and improves patients' ability to maintain family relationships and employment.[37]  Although MOUD is typically a comprehensive approach, the medication piece is the most critical and impactful, and should be provided even when counseling and other behavioral therapies are not available.[38]

34.     The FDA has approved three medications for treating OUD:  methadone, buprenorphine, and naltrexone.[39]  Not all these medications are equally effective for every

---

/files/images/Final_Report_Draft_11-15-2017.pdf (hereinafter "President's Commission on Combatting Drug Addiction, Final Report")

[34] *The Biden-Harris Administration's Statement of Drug Policy Priorities for Year One*, EXEC. OFF. OF THE PRESIDENT, OFFICE OF NAT'L DRUG CONTROL POL'Y (2021) https://www.whitehouse.gov/wp-content/uploads/2021/03/BidenHarris-Statement-of-Drug-Policy-Priorities-April-1.pdf.

[35] Richard N. Rosenthal, *Medication for Addiction Treatment (MAT)*, 44 AM. J. DRUG & ALCOHOL ABUSE 273 (2018); *Medications for Opioid Use Disorder Improve Patient Outcomes*, PEW (Dec. 17, 2020), https://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2020/12/medications-for-opioid-use-disorder-improve-patient-outcomes.

[36] Nora D. Volkow et al., *Medication-Assisted Therapies—Tackling the Opioid-Overdose Epidemic*, 370 NEW ENG. J. MED. 2063, 2064 (2014).

[37] *Id.*

[38] Rosenthal Decl. ¶ 26.

[39] SAMSHA, *MAT Medications, Counseling, and Related Conditions*, *supra*.

patient.  Studies show that only two—methadone and buprenorphine—produce longer-term treatment retention, which is the key to effective MOUD treatment.[40]

35.     Methadone and buprenorphine are "agonists," which means they activate opioid receptors in the brain to relieve withdrawal symptoms and control cravings.[41]  Methadone is a "full agonist," meaning that it fully activates opioid receptors, resulting in a stronger opioid effect.[42]  Buprenorphine is a "partial agonist," meaning that it partially activates opioid receptors.[43]  In commercially available treatments, buprenorphine is most commonly combined with naloxone, an opioid antagonist that serves as an abuse deterrent in the medication.  The most common brand name for this formulation is Suboxone, which is available in both sublingual tablet and sublingual film form.[44]

36.     The effect of both methadone and buprenorphine is much milder, steadier, and longer-lasting than drugs such as heroin, fentanyl, or oxycodone.  Because methadone and buprenorphine bind to the opioid receptors they stimulate, they block the receptors from being stimulated by more powerful agonists—meaning that patients taking methadone and buprenorphine cannot get the same "high" as they would from illicit drugs like heroin and fentanyl.[45]  This trains patients' brains to gradually decrease their response to, and cravings for, opioids.

---

[40] NAT'L INST. ON DRUG ABUSE, MEDICATIONS TO TREAT OPIOID USE DISORDER RESEARCH REPORT: HOW EFFECTIVE ARE MEDICATIONS TO TREAT OPIOID USE DISORDER? (Jun. 2018), *available at* https://www.drugabuse.gov/publications/research-reports/medications-to-treat-opioid-addiction/efficacy-medications-opioid-use-disorder.
[41] *Id.*
[42] *Medication Assisted Recovery:  Pharmacological Treatment*, INDIAN HEALTH SERV., https://www.ihs.gov/opioids/recovery/pharmatreatment/ (last visited Oct. 27, 2021) (hereinafter, "Indian Health Serv., *Medication Assisted Recovery*").
[43] *Id.*
[44] Declaration of Edmond Hayes (hereinafter, "Hayes Decl.") ¶ 5 n. 1.
[45] Nat'l Inst. on Drug Abuse, *Opioid Use Disorder Effects Millions*, *supra.*

37.     Because they act on opioid receptors without presenting the same risk of overdose, both methadone and buprenorphine have been designated as "essential medicines" by the World Health Organization.[46]

38.     Unlike buprenorphine and methadone, naltrexone is an "antagonist," which means it blocks opioid receptors without activating them, preventing the euphoric effect of opioids, and thus reducing desire for opioids over time.[47]  In patients who have already responded well to buprenorphine or methadone, it is medically inappropriate to provide naltrexone as a substitute. This is because patients' responses to medications for OUD vary significantly based on their individual profiles.  The severity of a patient's OUD may affect the relative effectiveness of each different medication.  For example, a patient with severe OUD (such as Mr. Patson) may require a medication that produces a stronger opioid effect (like a full agonist) to fully suppress opioid cravings as compared with a patient who suffers from more mild OUD.[48]  Naltrexone also does not relieve withdrawal symptoms, and in fact can trigger acute and severe withdrawal.  That withdrawal is especially severe when a patient has recently taken an opioid agonist or partial agonist such as buprenorphine.  For that reason, medical standards require that patients be fully withdrawn from other forms of MOUD medication before receiving naltrexone—a process that requires undergoing withdrawal prior to switching to naltrexone.[49]

---

[46] WORLD HEALTH ORG., WORLD HEALTH ORGANIZATION MODEL LIST OF ESSENTIAL MEDICINES, 22ND LIST 52, 60 (2021),  *available at* https://apps.who.int/iris/bitstream/handle/10665/ 345533/WHO-MHP-HPS-EML-2021.02-eng.pdf.
[47] Indian Health Serv., *Medication Assisted Recovery*, *supra*.
[48] Rosenthal Decl. ¶ 34.
[49] S.H. Boyce & Armstrong, J. Stevenson, *Effect of inappropriate Naltrexone Use in a Heroin Misuser*, 20 EMERGENCY MED. J., 381 (2003).

39.     Studies have also shown that naltrexone treatment produces substantially poorer outcomes in terms of treatment retention than either methadone or buprenorphine.[50]  Treatment retention is crucial for MOUD because length of treatment is positively correlated with outcomes:  The longer a patient stays in treatment, the better the treatment outcome.  Because methadone and buprenorphine are better able than naltrexone to keep patients in treatment for longer periods, they are the standard of care for OUD, particularly among patients with severe OUD.[51]

40.     Treatment with MOUD is necessarily individualized and depends on a patient's unique profile.  Some patients may do well on any form of MOUD; some may find that only one provides effective treatment without significant adverse side effects.  An MOUD that effectively treats one person may be completely ineffective, and thus dangerous, for another.  Accordingly, switching a patient from one form of MOUD that is currently working for that patient without significant side effects is medically contraindicated.[52]  SAMHSA has also highlighted that "dosing and schedules of pharmacotherapy must be individualized" to effectively treat a patient's MOUD.[53]

41.     Like other chronic disorders, OUD can be lifelong.[54]  There is no maximum recommended duration for treatment with MOUD.  MOUD medications are safe to use for life.[55]

---

[50] Nat'l Inst. on Drug Abuse, *Opioid Use Disorder Effects Millions*, supra.
[51] Rosenthal Decl. ¶ 33.
[52] *Id.* at ¶ 35.
[53] SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., MEDICATIONS FOR OPIOID USE DISORDER FOR HEALTHCARE AND ADDICTION PROFESSIONALS, POLICYMAKERS, PATIENTS, AND FAMILIES:  TREATMENT IMPROVEMENT PROTOCOL 63 (Updated 2020), ES-5, *available at* https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/PEP20-02-01-006.pdf.
[54] *Opioid Use Disorder*, AM. PSYCHIATRIC ASS'N (Nov. 2018), https://www.psychiatry.org/patients-families/addiction/opioid-use-disorder.
[55] SAMSHA, *MAT Medications, Counseling and Related Conditions*, supra.

42. Ending MOUD treatment prematurely is exceptionally dangerous. It triggers painful withdrawal symptoms that markedly increase the risk of relapse into opioid use, overdose, and death.[56]

43. Withdrawal from MOUD medication causes symptoms including bone and joint aches, vomiting, diarrhea, insomnia, excessive sweating, hypothermia, hypertension, tachycardia (elevated heart rate), and psychological symptoms like depression, anxiety, and desperation. Apart from the risk of relapse and overdose, other life-threatening complications such as pneumonia and fatal dehydration can occur.[57] The uncontrolled pain and psychological distress that results from withdrawal can also lead to suicidal ideation—that is, a patient experiencing suicidal thoughts—if not properly treated.[58]

44. If treatment with MOUD must be discontinued, it is crucial to taper methadone and buprenorphine as slowly as possible to avoid severe withdrawal symptoms. The process of tapering must occur slowly while the patient is closely monitored, and can take several months.[59]

45. Forcing a person with OUD to withdraw from effective MOUD treatment, when the patient is not experiencing significant side effects or contraindications from the treatment, violates the standard of care.[60] Further, doing so abruptly heightens the risk of acute withdrawal and is even more dangerous.[61]

---

[56] Shane Darke et al., *Yes, People Can Die from Opiate Withdrawal*, 112 ADDICTION, 199 (2016).
[57] *Id.*
[58] U.S. DEP'T OF JUST., INVESTIGATION OF THE CUMBERLAND COUNTY JAIL (Jan. 14, 2021) 6, *available at* https://www.justice.gov/opa/press-release/file/1354646/download (hereinafter "DOJ, Investigation of Cumberland County Jail").
[59] ASAM National Practice Guideline, *supra*.
[60] Rosenthal Decl. ¶ 37.
[61] ASAM National Practice Guideline, *supra*.

46.     Efforts to "medically manage" forced withdrawal or "detoxify" patients, using non-MOUD pain relievers or otherwise, are not effective.  Such efforts, also known as detoxification, worsen long-term outcomes for people with OUD. detoxification is not only ineffective, it is dangerous because it increases overdose risk.[62]

### C.     Allowing Access to MOUD Is Feasible in Correctional Settings and Is Particularly Important in Them.

47.     Providing MOUD is especially critical in carceral settings, where people with OUD face a dramatically heightened risk of relapse, overdose, and death in the weeks immediately following release.[63]

48.     A large proportion of incarcerated people have OUD.  More than half of people in prison have been diagnosed with a substance use disorder, and 15% of those in jails and prisons have OUD.[64]  In Michigan, more than 20% of incarcerated people have been identified as having OUD.[65]

49.     One study found that, in the two weeks following release from prison, formerly incarcerated people in the state of Washington ran a risk of death that is 12.7 times greater than residents of Washington who had not been incarcerated.[66]  The leading cause of death among that group was overdose.[67]  Another study found that "[t]he opioid overdose death rate is 129

---

[62] Edward V. Nunes & Matisyahu Shulman, *Commentary on Stein et al. (2020):  Whither Detoxification in the Face of the Opioid Epidemic?* 115 ADDICTION 95 (2019).
[63] Ingrid A. Binswanger et al., *Mortality After Prison Release:  Opioid Overdose and Other Causes of Death, Risk Factors, and Time Trends from 1999 to 2009*, 159 ANNALS OF INTERNAL MED. 592 (2013).
[64] Nora Volkow, *Nora's Blog:  The Importance of Treating Opioid Use Disorder in the Justice System*, NAT'L INST. ON DRUG ABUSE (July 24, 2019), https://www.drugabuse.gov/about-nida/noras-blog/2019/07/importance-treating-opioid-use-disorder-in-justice-system.
[65] Corrections Connection, *Ending Addiction*, *supra*, at 4.
[66] Ingrid A. Binswanger et al., *Release from Prison–A Higher Risk of Death for Former Inmates*, 356 NEW ENG. J. MED. 157 (2007).
[67] *Id*.

times higher for those recently released from incarceration compared to the rest of the adult population."[68]  The same study found that "[o]pioid-related deaths among persons recently released form incarceration have increased 12-fold between 2011 and 2015," and, "[i]n 2015, nearly 50% of all deaths among those released from incarceration were opioid-related."[69]

50.     People who have recently been released from incarceration without treatment will have a high risk of return to opioid use upon release, and presumably will have reduced opioid tolerance due to a period of nonuse.  This exposes them to a higher risk of overdose if they relapse, as they no longer have the tolerance to the same dose of opioids as before the period of forced withdrawal.[70]

51.     In 2017, President Trump's Commission on Combating Drug Addiction and the Opioid Crisis found that, "[i]n the weeks following release from jail or prison, individuals with or in recovery from [OUD] are at elevated risk of overdose and associated fatality."[71]  The Commission further found that treatment with MOUD is "correlated with reduced risk of mortality in the weeks following release and in supporting other positive outcomes."[72]

52.     Access to MOUD plays a critical role in reducing death in incarcerated populations and yields positive results in the carceral setting.  A 2016 national study in England regarding the use of MOUD in jails and prisons found that MOUD "was associated with a 75%

---

[68] Rosenthal Decl. ¶ 42.

[69] *Id*.

[70] SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., SAMHSA OPIOID OVERDOSE PREVENTION TOOLKIT (revised 2018) 1, *available at* https://store.samhsa.gov/sites/default /files/d7/priv/sma18-4742.pdf.

[71] President's Commission on Combatting Drug Addiction, Final Report, 1-2, *supra*.

[72] *Id*.

reduction in all-cause mortality and 85% reduction in fatal drug-related poisoning in the first month after release."[73]

53.     One study in Rhode Island observed a 60.5% reduction in opioid-related post-incarceration overdose deaths one year after a prison-based MOUD program was piloted.[74]  In addition, implementing an MOUD program has been shown to decrease drug trafficking in carceral settings because demand for contraband is lowered.[75]

54.     Withholding MOUD without a clinical reason is always dangerous, but it is especially dangerous for incarcerated individuals who have OUD, because they are especially likely to relapse and die upon release.

55.     In October of 2018, the National Commission on Correctional Health Care and the National Sheriffs' Association jointly released a guide on practices and guidelines for jail-based treatment for OUD.[76]  In doing so, they noted that MOUD "is considered a central component of the contemporary standard of care" for the treatment of individuals with OUD.[77]  Further, they warned that "correctional withdrawal alone actually increases the chances the person will overdose following community release due to loss of opioid tolerance."[78]

---

[73] John Marsden et al., *Does Exposure to Opioid Substitution Treatment in Prison Reduce the Risk of Death After Release? A National Prospective Observational Study in England*, 112 ADDICTION, 1408 (2017).

[74] Takeo Toyoshima et al., *The Evolving Medicolegal Precedent for Medications for Opioid Use Disorder in U.S. Jails and Prisons*, 49 J. AM. ACAD. PSYCHIATRY AND L. ONLINE (2021).

[75] Hayes Decl. ¶ 20.

[76] *See, generally* NAT'L SHERIFFS' ASS'N & NAT'L COMM'N ON CORR. HEALTH CARE, JAIL-BASED MEDICATION ASSISTED TREATMENT:  PROMISING PRACTICES, GUIDELINES, AND RESOURCES FOR THE FIELD (Oct. 2018), *available at* https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf (hereinafter "NCCHC & NSA, Jail-Based Medication Assisted Treatment")

[77] *Id.* at 5.

[78] *Id.* at 9.

56.     Recognizing the serious risks that OUD poses for incarcerated people, multiple governmental authorities and medical and professional associations have required or recommended that jails and prisons provide maintenance MOUD to those in their custody.

57.     In recent years, the U.S. Department of Justice ("DOJ") has consistently taken the position that access to MOUD is required in both carceral settings and court programs.  The DOJ has repeatedly confirmed that MOUD is the standard of care for treatment of OUD and that denying access to MOUD constitutes unlawful disability discrimination.[79]

58.     The DOJ's Adult Drug Court Discretionary Grant Program, which provides financial and technical assistance to state and local drug court initiatives, also requires grantees to permit the use of MOUD.[80]

59.     In 2018, Andrew Lelling, the U.S. Attorney for the District of Massachusetts initiated an investigation into the Massachusetts Department of Corrections for denying people access to MOUD.  In doing so, he warned that "all individuals in treatment for OUD, regardless

---

[79] Press Release, Dep't of Just., U.S. Atty's Off., Dist. of Mass., U.S. Attorney's Office Settles Disability Discrimination Allegations at Skilled Nursing Facility (May 10, 2018), https://www.justice.gov/usao-ma/pr/us-attorney-s-office-settles-disability-discrimination-allegations-skilled-nursing; Alison Knopf, *Department of Justice Tells State Attorney General: ADA Protects People on MAT*, ADDICTION TREATMENT F. (Apr. 17, 2018), https://atforum.com/2018/04/department-of-justice-tells-state-attorneys-general-ada-protects-people-on-mat/; *DEA Supports the Use of Medication Assisted Treatment for Opioid Use Disorder: Message for DATA Waived Practitioners and Those Eligible to Become DATA Waived*, DIVERSION CONTROL DIV., https://www.deadiversion.usdoj.gov/pubs/docs/mat.htm (last visited Oct. 27, 2021); U.S. DEP'T OF JUST., *FY 2021 Budget Request:  First Step Act*, *available at* https://www.justice.gov/file/1246146/download.

[80] DEP'T OF JUST., *Adult Drug Discretionary Grant Program FY 2018 Competitive Grant Announcement* 12 -13 (June 5, 2018), *available at* https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/BJA-2018-13601.PDF.

of whether they are inmates or detainees, are already protected by the ADA, and [] the

[Department of Corrections] has existing obligations to accommodate this disability."[81]

60.      In 2021, the DOJ's Civil Rights Division issued a report concluding that the

Cumberland County Jail in Bridgeton, New Jersey, had violated the Eighth and Fourteenth

Amendments to the U.S. Constitution by failing to provide MOUD to people in its custody.[82]

The report found that inadequate treatment of OUD presented a risk of serious harm and likely

caused six of the jail's seven suicide deaths in the period studied.[83]  It also found that the jail had

been deliberately indifferent to that risk by failing to prescribe MOUD, despite knowing people

in its custody had significant heroin usage or obvious symptoms of opioid withdrawal.[84]

61.      The American Society of Addiction Medicine, the leading professional society in

the country on addiction medicine, also recommends treatment with MOUD for people with

OUD in the criminal justice system.[85]

62.      SAMHSA has also recognized that MOUD should be expanded in criminal justice

settings.[86]

63.      Ensuring the robust access to MOUD treatment that these agencies and

organizations support is both feasible in, and beneficial to, carceral settings.  In recommending

expanded access in jails and prisons to MOUD, both the National Commission on Correctional

---

[81] Letter from Andrew E. Lelling, United States Attorney, District of Massachusetts, to David Solet and Jesse Caplan, General Counsels for the Executive Office of Health and Human Services (Mar. 16, 2018), *available at* https://d279m997dpfwgl.cloudfront.net /wp/2018/03/20180322172953624.pdf.

[82] DOJ, Investigation of Cumberland County Jail, *supra,* at 22.

[83] *Id.* at 9-10.

[84] *Id.*

[85] ASAM, Policy Statement on Access to MAT, *supra.*

[86] SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., MEDICATION-ASSISTED TREATMENT (MAT) IN THE CRIMINAL JUSTICE SYSTEM: BRIEF GUIDANCE TO THE STATES, *available at* https://store.samhsa.gov/sites/default/files/d7/priv/pep19-matbriefcjs_0.

Health Care and the National Sheriffs' Association have emphasized that such access "[c]ontribut[es] to the maintenance of a safe and secure facility for inmates and staff"; and reduces recidivism, withdrawal symptoms, the risk of post-release overdose and death, and disciplinary problems.[87]  Additionally, comprehensive drug treatment programs in jails are associated with reduced system costs.[88]

64.    Correctional facilities in Michigan have also recognized the necessity of providing MOUD treatment.  In 2019, the Michigan Department of Corrections (MDOC) launched a pilot program, providing MOUD in three of its facilities with the goal of expanding treatment to all of its facilities by 2023.[89]

65.    The Monroe County Sheriff's Office has achieved a proper standard of medical care for opioid addiction by providing MOUD.  Sheriff Troy Goodnough reasoned, "It's the right thing to do . . .  We need to give them the opportunity to be productive members of society."[90] In this judicial district, Kent County Correctional Facility provides MOUD to people with OUD. Undersheriff Chuck DeWitt explained, "Everyone should have medical treatment and, as law enforcement officials, we should not dictate what course that treatment needs to take."[91]

---

[87] NCCHC & NSA, Jail-Based Medication Assisted Treatment, at 5.
[88] *Id*.
[89] Press Release, Michigan Opioids Task Force, *supra*.
[90] Kara Vensel, *Monroe County Jail Awarded Gold Standard of Medical Care*, Monroe News (Sept. 17, 2021), https://www.monroenews.com/story/news/2021/09/17/monroe-county-jail-awarded-gold-standard-medical-care/8339564002/.
[91] Susan Samples, *Kent County Jail Expands Program to Fight Opioid Abuse*, Wood TV 8 (Jan. 20, 2020), https://www.woodtv.com/news/target-8/kent-county-jail-expands-program-fighting-opioid-abuse/.

66.     Numerous other Michigan counties provide some form of MOUD in their jails, including Eaton, Oakland, and St. Clair.[92]

67.     As recognized by these authorities, OUD is a chronic relapsing condition that requires medically appropriate treatment just like other chronic diseases.  Once patients start on MOUD, they need to be maintained on that treatment under medical supervision.  Any other course of action—including forced withdrawal—is not supported in the medical community and subjects patients to excruciating and unnecessary withdrawal symptoms and elevated risk of relapse and death.

68.     Defendants' own practice of providing Suboxone for people who are incarcerated on a short-term basis demonstrates the feasibility of ensuring access to such treatment for people who are incarcerated long-term.

**D.     Defendants Have and Will Deny Mr. Patson Medically Necessary Treatment for His OUD.**

69.     Mr. Patson has battled severe OUD since early 2020.  He first sought treatment in November 2020, and was prescribed Suboxone by his physician, Dr. Kelly Clark.  Like many other people who battle OUD, he had a brief period of relapse.  However, by May of 2021, Mr. Patson had achieved early remission by regularly using his physician-prescribed Suboxone.

70.     Alongside Mr. Patson's OUD, he also battles numerous co-occurring disorders. These include major depression, anxiety, and post-traumatic stress disorder.  He also has a history of suicide attempts.  These co-occurring disorders have been exacerbated when Mr.

---

[92] Sarah Cwiek, *St. Clair County Jail Joins Small but Growing Ranks of Jails Offering Addiction Medication*, MICH. RADIO (May 9, 2019), https://www.michiganradio.org/health/2019-05-09/st-clair-county-jail-joins-small-but-growing-ranks-of-jails-offering-addiction-medication.

Patson was not treating his OUD, and will again be exacerbated if Mr. Patson is denied treatment.[93]

71.     Dr. Clark began prescribing Suboxone Mr. Patson's OUD in April 2021.  By May 2021, he had achieved early remission by taking Suboxone regularly.  Both Mr. Patson and Dr. Clark recognize that when Mr. Patson is treating his OUD, he does not engage in the risky behaviors that have resulted in his criminal history.  When he is being treated, he goes to support group meetings every night, sees a counselor regularly, and actively looks for work.

72.     On June 9, 2021, Mr. Patson's course of treatment was disrupted when he was incarcerated at the Jail for a bond violation.  Defendants refused to continue MOUD, and refused to provide him with Suboxone during the course of his stay.  Defendants persisted in their refusal even after Mr. Patson's criminal defense attorney obtained an order requiring that Mr. Patson continue his treatment.

73.     On June 11, 2021, Mr. Patson's grandmother contacted Dr. Clark's office and informed her that Mr. Patson had been incarcerated and that the Jail was denying him his Suboxone.  Dr. Clark contacted the jail and spoke with a nurse.  Dr. Clark stressed that it was urgent and necessary that Mr. Patson continue his treatment.  The nurse told Dr. Clark to send a letter.  Dr. Clark sent a letter the same day, stating that Suboxone had been life saving for Mr. Patson and that it would be dangerous to stop his treatment.

74.     On June 12, 2021, the Jail gave Mr. Patson one dose of Suboxone.  The following day, Mr. Patson slept through medical rounds, and it is therefore unknown if he would have been offered Suboxone that day.  After waking up, Mr. Patson requested his Suboxone and it was

---

[93] Clark Decl. ¶ 5.

denied to him.  At that point, the Jail discontinued providing him with Suboxone, but continued to provide him with his other medications as prescribed.

75.     After the Jail discontinued his medically necessary Suboxone treatment, Mr. Patson began experiencing withdrawal symptoms immediately and told his grandmother that his mental status was deteriorating.  He had stomach cramps and could not eat or sleep.  His grandmother became worried and contacted Dr. Clark.

76.     On June 15, 2021, Dr. Clark made contact with the Jail's attending physician Dr. Ann Kuenker.  Dr. Kuenker is allocated one hour per week to see everyone at the Jail who needs medical attention.[94]  On information and belief, Dr. Kuenker does not specialize in and has no particular training or expertise in the treatment of substance use disorders.  Dr. Clark again explained to Dr. Kuenker that it was medically necessary for Mr. Patson to continue his Suboxone therapy.  Rather than addressing why the Jail refused Suboxone to Mr. Patson, Dr. Kuenker began the conversation by discussing Mr. Patson's criminal record.  She also asked Dr. Clark to verify that she had sent the June 11 letter, claiming it looked "photoshopped."  Dr. Clark confirmed that she had sent the letter and again stressed that Mr. Patson must receive his Suboxone treatment.

77.     On June 17, 2021, Dr. Kuenker left a message for Dr. Clark, stating that Mr. Patson's bond had been set at a high amount, which rendered it unlikely that he would be released soon.  Accordingly, Dr. Kuenker advised Dr. Clark, the Jail would not provide him with Suboxone.  Without providing any medical explanation, Dr. Kuenker stated that Mr. Patson would not be permitted to take Suboxone during a long term stay in the Jail.[95]

---

[94] Tr. Def.'s Mot. Hr'g at 31, People v. Phillips, No. 21-5283-FY-1 (86th Dist. Ct. Grand Traverse Cnty. July 24, 2021).
[95] Clark Decl. ¶10.

78.     The facility instead implemented its "detox protocol," which consists of a complete denial of MOUD treatment.  Instead, patients are provided with nothing more than Gatorade and over-the-counter pain medications like Tylenol to combat the excruciating symptoms of withdrawal from MOUD.

79.     Mr. Patson's withdrawal symptoms worsened.  He was restless, but every movement he made was painful.  His bones felt like they were bruised.  He was sweating and freezing at the same time and could not sleep.  He had no appetite, just diarrhea and vomiting. He was in excruciating pain.[96]  During a video visit, he told his grandmother that he thought he should kill himself while he was in the Jail.

80.     Mr. Patson's grandmother alerted Dr. Clark, who became extremely concerned because she was aware of his co-occurring mental health disorders.  Dr. Clark wrote another letter explaining that Mr. Patson was a high-risk individual with a history of suicide attempts, and that he needed to continue his OUD treatment because his mental health would continue to decline without it.  In case the Jail continued to deny Suboxone, Dr. Clark even offered to prescribe Sublocade, an injectable buprenorphine formula administered once a month, in the alternative.  If Mr. Patson were not being forced to withdraw from Suboxone, there would have been no cause or necessity for him to receive a Sublocade injection.

81.     In response, the Jail placed Mr. Patson into isolation because Jail staff had concluded that he presented a suicide risk.  However, Jail staff refused to provide Mr. Patson with what he really needed:  His MOUD treatment.  This is despite Dr. Clark's letters to staff,

---

[96] Mardi Link, *Rough Recovery: Courts, Jails Slow to Adapt to Best-Practices for Addiction Treatment*, REC. EAGLE (Sep. 26, 2021), https://www.record-eagle.com/news/rough-recovery-courts-jails-slow-to-adapt-to-best-practices-for-addictiontreatment/ article_74712076-1be3-11ec-820f-4792954ccbe2.html.

advising them that continued Suboxone treatment was necessary to combat Mr. Patson's

declining mental health, including the risk of suicidal ideation.

82.     On June 23, 2021, Mr. Patson's grandmother alerted Dr. Clark that the Jail had

placed Mr. Patson into isolation.  Dr. Clark wrote another letter, again stating that Mr. Patson's

opioid withdrawal was affecting his mental health and that the isolation was making it worse.

She asked the Jail to place Mr. Patson into the general population, and again asked that he be put

back on his necessary Suboxone treatment.

83.     On June 24, 2021, the pharmacist at the Jail called Dr. Clark and advised her that

she would prescribe Sublocade if Dr. Clark could transport the medication to the facility.  The

Jail also advised Dr. Clark that it was not able to store Sublocade and would not be either able or

willing to provide it themselves.  Dr. Clark was aware that there are strict laws about controlled

substances, so she left a message with a Drug Enforcement Agency ("DEA") diversion agent to

make sure this was acceptable before proceeding.

84.     While Dr. Clark was waiting for return contact from the DEA diversion agent, she

began to coordinate with the Jail regarding the prescription for Sublocade.  She then learned that

the Jail wanted her to leave the medication in a drop box and that she would not be permitted to

administer the injection herself.  This troubled Dr. Clark because administering Sublocade

incorrectly can cause serious harm or death.

85.     Subsequently, Dr. Clark's pharmaceutical representatives advised her that the

plan violated regulations about the transportation of Sublocade and that doing so would place her

medical license at risk.  She left two more messages for the DEA agent to determine whether

anything could be done.  Dr. Clark received no call back.  At that point, having learned that the

Jail refused to follow her instructions that Mr. Patson be given Suboxone during his

incarceration, and not being able to alleviate Mr. Patson's suffering by providing Sublocade, Dr.

Clark reluctantly informed the Jail that she had no choice but to defer to the Jail's medical team.

86.     By the time Mr. Patson was released, he had suffered a significant relapse in all of

his co-occurring disorders.  After he was released, he promptly resumed care with Dr. Clark,

who began treating him with Suboxone again.  He has been successful at keeping his OUD in

remission because of this.  He has not used illegal drugs while on Suboxone.  Unfortunately, he

has not recovered from the relapse in his co-occurring disorders.  While he awaits sentencing,

Mr. Patson has been participating in a partial hospitalization program for his depression, anxiety,

and suicidal ideations.  As a result of these lasting consequences of his forced withdrawal, he has

not been able to resume employment since his release.

### E.     Defendants Categorically and ArbitrarilyDenies MOUD for OUD.

87.     As a matter of policy and practice, Defendants categorically and arbitrarily denies

people who are incarcerated long-term access to MOUD, except for pregnant people, even if

MOUD has been prescribed by a physician as medically necessary treatment.  Defendants have

no apparent plans to alter this policy for the foreseeable future.

88.     MOUD treatment, such as Suboxone and methadone, is "not allowed" in the Jail,

because it "does not fit with the present program of jail and treatment."[97]  Defendant Bensley

rationalized that the correctional facility is ". . .a jail[,]  [] not a hospital, [] not a mental health

facility."[98]  Defendant Bensley has not wavered from this position, and recently confirmed that

---

[97] Sheri McWhirter, *Prescribed Recovery:  Medication-Assisted Treatment Used to Combat Addiction*, REC. EAGLE (Nov. 11, 2018), https://www.record-eagle.com/news/local_news/prescribed-recovery/article_1c220e17-c383-5740-8a76-657e8927894e.html.
[98] Mardi Link, *Attitudes, Funding Keep MAT Out of Area Jails*,  REC. EAGLE (Oct. 26, 2019), https://www.record-eagle.com/news/local_news/attitudes-funding-keep-mat-out-of-area-jails/article_a65b27dcec5e-11e9-ba64-1fa4acb9df2f.html.

the Jail would not provide Suboxone, even when a state court judge indicated his expectation that Mr. Patson would receive MOUD treatment during his prior stay in the Jail.  In doing so, Defendant Bensley stated, "[t]hese were sentencing orders to the defendants, not to the jail.  It's pretty simple—don't go to jail.  And if you do, you'll be treated by the medical professionals we hire."[99]

89.    Mr. Patson anticipates being sentenced to the Jail on November 12, 2021. Without judicial intervention, Defendants will again subject Mr. Patson to their compulsory-withdrawal policy and he will be forced to withdraw from his Suboxone again.

90.    As explained above, incarcerated people with OUD have a heightened risk for relapse and overdose, with risk of overdose and death especially high in the first weeks immediately following release.  Accordingly, Defendants' policies have already once forced Mr. Patson into a dangerous and potentially life-threatening withdrawal.  If  Defendants' practices are not immediately enjoined, Mr. Patson will again be subjected to forced withdrawal and the concomitant risks to his immediate and long-term health.

91.    Mr. Patson's OUD is a serious medical need and a recognized disability.  If untreated, it is likely to result in relapse and potentially a fatal opioid overdose, among other things.

92.    Suboxone is medically necessary for the treatment of Mr. Patson's serious medical condition.

93.    On October 8, 2021, Mr. Patson's criminal defense counsel sent a letter to Defendant Bensley, informing him of Mr. Patson's serious medical need and requesting

---

[99] Mardi Link, *Repeat Ruling: Sheriff, Not Courts, Control the Jail*, REC. EAGLE (Aug. 1, 2021), https://www.record-eagle.com/news/repeat-ruling-sheriff-not-courts-control-the-jail/article_8d024b02-f21b-11eb-9e20-2f12b4b22f6e.html.

assurance that Mr. Patson will be provided with MOUD, specifically including his physician-prescribed doses of Suboxone, during his time at the Jail.  The letter requested a response by October 15, 2021.  As of this filing, Mr. Patson's counsel has received no response.

94.     Defendants have been informed of Mr. Patson's diagnosis multiple times and advised of the risk of serious harm or death should he continue to be denied medical treatment.  However, it is evident that they will not provide such treatment while he is incarcerated in their facility.

### COUNT I – 42 U.S.C. § 1983 AND THE EIGHTH AMENDMENT
### (Deliberate Indifference to Serious Medical Need in Violation of the Eighth Amendment)

95.     The foregoing allegations are re-alleged and incorporated herein.

96.     Defendants, while acting under color of state law, will deliberately, purposefully, and knowingly deny Mr. Patson access to necessary medical treatment for his OUD, which is a serious medical need.

97.     Denying Mr. Patson access to his prescribed dosage of Suboxone will cause him physical and psychological suffering, will expose him to heightened risk for other serious medical conditions, and could trigger relapse into active addiction, potentially resulting in overdose and death.

98.     As applied to Mr. Patson, the denial of treatment by Defendants amounts to deliberate indifference to a serious medical need, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment and 42 U.S.C. § 1983.

### COUNT II – AMERICANS WITH DISABILITIES ACT
### (Unlawful Discrimination Against Qualified Individuals with Disabilities)

99.     The foregoing allegations are re-alleged and incorporated herein.

100.     The Jail, which is overseen by Defendants, is a public entity subject to the ADA.

101.    Drug addiction is a "disability" under the ADA.  *See* 42 U.S.C. §§ 12102 and

12131(2); C.F.R. § 35.108 (the phrase "physical or mental impairment includes, but is not

limited to . . . drug addiction, and alcoholism.")

102.    The ADA applies to people, like Mr. Patson, who suffer from OUD.

103.    Defendants have denied and will deny Mr. Patson the benefits of the Jail's

medical programs on the basis of his disability by denying him treatment for OUD.

104.    Defendants will refuse to make a reasonable accommodation for Mr. Patson by

providing him with access to his prescribed dosage of Suboxone during his incarceration, thereby

discriminating against him on the basis of disability, even though accommodation would in no

way alter the nature of the healthcare program.  Defendants do not deny medically necessary,

physician-prescribed medications to people with other serious, chronic medical conditions, such

as diabetes, which is illustrated by Defendants' own willingness to provide Mr. Patson with all of

his other prescribed medications.

## PRAYER FOR RELIEF

Mr. Patson asks this Court to GRANT the following relief:

1.    Emergency, preliminary, and permanent injunctive relief ordering Defendants to

provide him with access to MOUD, including the Suboxone dosage prescribed by his physician

(or an equivalent generic drug combination), during his incarceration;

2.    Declaratory relief;

3.    Award Mr. Patson his attorneys' fees and costs; and

4.    Any further relief this Court deems just and proper.

Respectfully submitted,

*/s/ Syeda Davidson*
Syeda Davidson (P72801)
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
sdavidson@aclumich.org
pmayor@aclumich.org
dkorobkin@aclumich.org

Alexandra D. Valenti (application for admission pending)
Christine Armellino (application for admission pending)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.:  212.813.8800
Fax:  212.355.3333
AValenti@goodwinlaw.com
CArmellino@goodwinlaw.com

Amelie Hopkins (application for admission pending)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.:  617.570.1000
Fax:  617.523.1231
AHopkins@goodwinlaw.com

*Attorneys for Plaintiff Cyrus Patson*

Dated:    October 28, 2021